WM. MUELLER & SONS v. CHANHASSEN REDI MIX AND OTHERS.

140 N. W. (2d) 326.

February 18, 1966—No. 39,533.

*Fred Clausen,* for appellants.
*Edward J. Gavin,* for respondent.

FRANK T. GALLAGHER, C.

This is an appeal from an order of the district court denying a motion for a new trial.

Plaintiff is a partnership which operates a gravel pit at Hamburg, Minnesota. From June 1962 to September 1963 it was the exclusive supplier of sand, gravel, pea rock, and binder to defendant Chanhassen Redi Mix (referred to hereinafter as Redi Mix), a corporation operating a ready-mix concrete plant at Chanhassen, Minnesota.

Plaintiff brought the present action to collect $29,871.01 claimed to be owed by defendants for goods sold and delivered between June 22, 1962, and January 1, 1964. The defendants in their answer denied that the individual defendants, James E. Bruzek and Ed Studer, were liable for plaintiff's claim and alleged that a substantial part of the materials sold and delivered by plaintiff were not fit and proper for use in the concrete mix made by Redi Mix and that plaintiff had knowledge or should have had knowledge of this fact. Redi Mix also interposed a counterclaim for more than $50,000, alleging that it had expended considerable time and effort in an attempt to mitigate damages caused by the materials furnished it by plaintiff; that it had expended $1,323.85 for such purposes and might expend more; that it had lost the floor and driveway business of one of its best regular customers and, upon information and belief, had lost a great deal of the same kind of work from other customers and prospective customers; and that its business reputation for quality materials had been greatly damaged and impaired.

We shall not attempt to set out in detail all of the testimony which was adduced at the trial. Arnold Ische, a partner in plaintiff, explained the nature of its business, which in general consisted of selling the products from its gravel pit for use in the construction of buildings and roads. He said that he first talked with defendant Studer about the middle of June 1962 regarding the sale of sand, gravel, pea rock, and binder; that he quoted a price which was "okay and everything, so we took the job." He said he first extended credit to Studer and that during the years 1962 and 1963 plaintiff delivered "much" of its products to Studer and Redi Mix.

Ische identified ledger sheets, later placed in evidence, showing transactions that had taken place between plaintiff and defendants. He testi-

fied that at the commencement of the lawsuit the balance of the account due from Redi Mix as reflected by the exhibits was $27,825.70 and the agreed service charges brought the total amount up to $29,871.01. An examination of the ledger sheets discloses that all charges entered on them were made to "Chanhassen Redi Mix, Chanhassen, Minnesota," and none to defendant Studer. Defendant Bruzek, president of Redi Mix, admitted the correctness of the amount shown as due.

Materials ordered by Redi Mix were delivered directly to its plant. Payments were by checks of Redi Mix corporation, with the exception of one payment made by a check which was payable to Redi Mix and endorsed by it to plaintiff. The companies dealt with each other for a considerable time on a credit basis with no specific credit arrangements. It was not until 1963 that plaintiff requested a specific payment by Redi Mix to be made each day to offset the latter's growing account. Redi Mix complied with this request and tried to work out various other arrangements to alleviate the financial problems it was encountering.

Mr. Bruzek testified that because of these financial difficulties he had held discussions with Mr. Ische and other partners in plaintiff concerning the possibility of an arrangement whereby plaintiff would become a part owner of Redi Mix, since Redi Mix had no money to pay plaintiff. The witness also stated that Ische indicated that it was not feasible for plaintiff to enter into such an arrangement.

Bruzek further testified that in August 1963 a regular customer to which Redi Mix sold a considerable amount complained to him regarding a floor laid with a Redi Mix product. He then looked at the floor and said that it was pock-marked; that there were also little pieces that were popping up on the floor; and that under each one of those pieces was a "little black stone," which he claimed was shale. He claims that he reported this complaint to Ische and told him that they were having problems with shale in the sand. According to the witness, Ische stated that it could not be shale because plaintiff had never had any problem with it before. He said Ische looked at some samples taken from the floor but "did not say too much."

Bruzek said that a short time later another customer called his attention to a second defective floor. He found that it also was pock-marked and

broken up in little pieces and that under each spot was a little black stone which he again recognized as shale. He explained that he knew that the materials used on these jobs came from plaintiff by checking his records. He said that he told Ische that something would have to be done about the recurrence of shale in the mixture and that Ische came over about August 20, 1963, and said he would see what could be done.

The witness also said that they received approximately 14 similar complaints during August and September 1963 and that he called these problems to Ische's attention several times. Bruzek said that he personally went out and examined the floors and driveways involved; that he "found the same condition on all 14 jobs"; and that his records verified that the material in each case came from Redi Mix. He said that he told Ische that there was shale in the sand and that "if he couldn't clean it up, we couldn't use it because we were losing customers over this particular thing." Summarizing this conversation with Ische, the witness said that they talked over the matter of the floors popping from time to time; that "we were trying to work together to cure this thing"; and that Ische "was going to work his piles a little bit to the best of his ability." Objection to testimony that Redi Mix incurred expense in meeting the complaints was sustained.

It appears from the record that about August 1, 1963, Norman E. Henning, chief engineer for Twin City Testing and Engineering Laboratory, Inc., examined the stockpiles in plaintiff's gravel pit from which it supplied material to ready-mix plants and discussed the content of shale in the sand with Mr. Ische. The witness said that his meeting with Ische concerned a job, performed by another ready-mix company, which "looked like it had chicken pox." After objections by plaintiff and discussions between the court and counsel with respect to admissibility of such evidence and other matters, the court stated that references by the witness to any gravel not used at the plant operated by Redi Mix had no bearing in this case. After further discussions as to the admissibility of the evidence and some objections by plaintiff, counsel for defendant was permitted to call Ische in order to show that materials used by Redi Mix came from the stockpiles under consideration.

Ische remembered that Henning came to plaintiff's pit, about August

1; that he was with him when Henning examined the pit and took samples; and that materials from the pit were later sold to Redi Mix and other customers. He admitted that he and Henning discussed procedures to be used in operating the pit. Ische indicated, however, that plaintiff had no shale problem, saying that there was always some shale in pits. He thought, however, that "Mr. Henning knows more about our pit than we ourselves because he tests the gravel where I don't." He also said that he made no report to Mr. Bruzek about the matters he discussed with Henning. He claimed that the State Highway Department made several tests of those materials and that it never refused to take any gravel, aggregate, or pea rock from plaintiff's pit on account of any lack of quality.

Henning was then recalled to the stand and testified, with blackboard illustrations, as to what is meant by the term "popping" of floors. He said that such floors eventually have 60 to 100 little pockmarks per square foot and that there were 3 particles that cause such marks — shale, laminate, and a certain type of light iron oxide.

He further said that the laboratory tests of the samples taken from plaintiff's pits August 1 showed that one sample was a well-graded sand which had a shale content of 0.75 percent and that the other, which was taken from the bottom of the pit, had a shale content of 4.65 percent. He said that when the sun shines down on a pit day after day the shale dries and flows to the bottom of a stockpile. His recommendations for the use of the pit on hot days was "to run on the side away from the sun so you are getting shale that is moist when it goes into the concrete." He also said that Ische did not deny that plaintiff had a shale problem but he did not agree with the witness as to its cause.

After both parties rested, plaintiff moved for a directed verdict in its behalf against Redi Mix and Studer for the amount shown in the complaint. (Although conceding that there was no evidence establishing personal liability on the part of Bruzek, plaintiff argued that a verdict should be directed against Studer because Ische had testified that credit was extended to Studer and there was no denial of this in the record.) Plaintiff also moved for a directed verdict against Redi Mix on the counterclaim,

contending that there was no evidence to support the counterclaim. The court agreed and granted plaintiff's motions.

The legal questions raised on appeal by defendants Redi Mix and Studer are:

(1) Is the verdict directed justified by the evidence and, therefore, not contrary to law?

(2) Did the trial court by sustaining the numerous objections of plaintiff's counsel to testimony offered by defendants; by refusing to permit offers of proof of excluded testimony by defendants; and by threats of contempt of court citations against defendants' counsel, deprive the defendants of a fair trial?

The rule is well settled in this state that a verdict may be directed only in cases where it clearly appears to the court that it would be its manifest duty to set aside a contrary verdict as not justified by the evidence or as contrary to the law applicable in the case. A motion for a directed verdict presents a question of law only. It admits for the purpose of the motion the credibility of the evidence for the adverse party and every inference which may fairly be drawn from the evidence. Kolatz v. Kelly, 244 Minn. 163, 69 N. W. (2d) 649; Coleman v. Huebener, 269 Minn. 198, 130 N. W. (2d) 322; Lee v. Smith, 253 Minn. 401, 92 N. W. (2d) 117; Olson v. Evert, 224 Minn. 528, 28 N. W. (2d) 753.

Applying this well-established rule to the facts of this case, the first conclusion we must draw is that the evidence sustains a directed verdict against Redi Mix on the claim alleged in the original complaint. The facts clearly establish that Redi Mix bought the material from plaintiff, used it in preparation of their mix for sale, and did not pay the amount due for this material. As already stated, the president of Redi Mix admitted that the balance shown on plaintiff's books as due was correct. It would have been error for the court to submit to the jury a question such as this where there was absolutely no contradictory testimony or dispute with regard to the amount of the indebtedness claimed by plaintiff.

It is true that a motion for a directed verdict accepts the view of the evidence most favorable to the adverse party. Stotzheim v. Djos, 256 Minn. 316, 98 N. W. (2d) 129; Village of Plummer v. Anchor Cas. Co. 240

Minn. 355, 61 N. W. (2d) 225. However, in this case, there was no evidence presented by Redi Mix to prove that it did not owe the account or that the amount was not correct.

The next problem we must consider is whether the directed verdict against Studer was proper. We think not.

The facts clearly demonstrate that plaintiff dealt with Redi Mix as a corporate business. The books of original entry show the corporation as the debtor. All bills for accounts were made to the corporation. Nowhere in the evidence was there any dispute that the plaintiff had dealt with Redi Mix as a corporation; neither does it convincingly appear that plaintiff considered Studer personally liable for the debts of the corporation. Even counsel for plaintiff at oral argument appeared to recognize that the directed verdict against Studer was improper as there was no evidence to sustain such a conclusion. The result that follows, therefore, is that only the directed verdict against Redi Mix can stand, while the verdict against Studer must be reversed.

The other matter which concerns this court is the direction of the verdict against the counterclaim. Applying the rules previously cited to the facts of this case, we find that nowhere was there established any connection between the shale problem of plaintiff and the "popping" of the floors poured from mix by Redi Mix. Defendants did not introduce any testimony, expert or otherwise, to prove the lack of quality in the materials supplied by plaintiff. It also seems somewhat odd to us that apparently no serious complaints were made by Redi Mix about the quality of plaintiff's material prior to the time plaintiff attempted to collect its bill. Direction of the verdict against Redi Mix with respect to the counterclaim was proper as the evidence presented was not sufficient to create a fact question for the jury.

The record here, in addition to the evidence, is replete with objections, offers of proof, conferences, and discussions of counsel with the court before the bench and in chambers. We shall not attempt to detail the various matters considered in these many instances. It is our opinion, after reviewing the record and examining the court's rulings on the many matters on which it passed, that a fair and reasonable consideration was given both parties, and we find no reversible error with respect to its

rulings. In fact it seems to us that the court generally displayed patience and tolerance throughout the trial.

Judgment ordered in favor of Ed Studer; otherwise affirmed.